# Third District Court of Appeal

**State of Florida**

Opinion filed September 24, 2014.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D10-3264
Lower Tribunal No. 06-1071 K
_____

**Omar Ricardo Brown,**
Appellant,

vs.

**The State of Florida,**
Appellee.

An Appeal from the Circuit Court for Monroe County, David J. Audlin, Jr., Judge.

Carlos J. Martinez, Public Defender, and Brian L. Ellison, Assistant Public Defender, for appellant.

Pamela Jo Bondi, Attorney General, and Douglas J. Glaid, Senior Assistant Attorney General, for appellee.

Before SHEPHERD, C.J., and WELLS and LAGOA, JJ.

LAGOA, J.

Omar Ricardo Brown ("Brown") appeals from the trial court's denial of his motion to suppress and his subsequent conviction. Because we find that the trial

court erred in its denial of Brown's motion to suppress, we vacate the judgment and sentence and remand with directions that the motion be granted.

I.    FACTUAL AND PROCEDURAL HISTORY

Brown was charged under section 812.13(2)(a), Florida Statutes, with armed robbery of the Beachcomber Jewelry Store located in Key West, Florida. Witnesses of the robbery described one robber wearing a beanie hat with blue gloves. Another robber was seen using a heavy object to break three glass cases containing jewelry. The getaway vehicle was described as a red vehicle.

Around the time of the robbery, Brown's former girlfriend, Maria Terrell, reported her white car stolen by Brown. Officer Diaz responded to the call but discontinued the investigation when Terrell advised Officer Diaz that the car was not stolen, and that she did not wish to press charges. This information was then relayed to Officer Zamora and other officers via the police station's radio channel, worn on the officers' person. At the suppression hearing, Officer Zamora testified that he knew that the reportedly stolen vehicle had been returned and no longer required further investigation. Officers Zamora and Barrios nonetheless headed to Brown's residence after hearing the report of Terrell's stolen white car. Officer Zamora testified that he went to Brown's residence based on a suspicion that the stolen car and the robbery were related. Officer Zamora testified that, upon arrival at Brown's residence, he had no articulable reason, nor probable cause, to believe that Brown had robbed the jewelry store. Officer Barrios also testified that by the

2

time he and Officer Zamora arrived at Brown's house they knew the reported stolen car had been returned.

The entrance to Brown's residence is separated from the community by two fences and is not in a common area accessible to the community. The first fence stands four feet tall at the front of the property, while the second fence, directly behind the first, stands six feet tall and closes off the side yard of the property. Brown's mailbox is located outside of the first fence. In order to reach Brown's front door, an individual must walk through both gates. On the day in question, the first gate was slightly ajar. Brown testified that he did not expect uninvited individuals to be in his side yard that led to the front door, and photographs of Brown's residence show the existence of several "No Trespassing" signs posted on Brown's outer fence. The officers at the scene, including Officer Zamora, testified that the items subsequently seized could not be seen from outside the fenced area, even if the first gate was slightly ajar.

On the day in question, police officers went through both of Brown's unlocked fences and knocked on Brown's front door in order to discuss Brown's whereabouts. During a conversation with the home's residents, the officers noticed gloves laying on a small table located outside by the front door. The officers then heard Brown enter the residence through a window on the side of the residence and went to investigate. Brown immediately told the police to get off of his property.

When the officers returned to the front door, the gloves had disappeared. Officer Zamora began to look for the gloves near the outside table. During his search, Officer Zamora looked over the table and found a hammer lodged between the fence and the table. The hammer was subsequently seized by the officer prior to obtaining a search warrant.

Hours later, a search warrant was secured and evidence was recovered from Brown's residence linking him to the robbery; the hammer that was obtained prior to the search warrant was not linked to the robbery.

Brown moved to suppress, arguing that the officers entered the curtilage of his residence without probable cause. After the suppression hearing, the trial judge entered a written order denying Brown's Motion. In the order, the trial judge found that the officers' entry into the curtilage of Brown's residence was part of a lawful investigation conducted "in good faith to complete the pending" car theft investigation, that the hammer and gloves were in "plain view" when the officers observed them, and that the warrant, which was based on those observations, was therefore valid. The trial court did not make a legal finding with respect to Brown's privacy rights in the curtilage surrounding his home. Following a jury trial, Brown was found guilty and sentenced to life in prison. This appeal followed.

II.    STANDARD OF REVIEW

4

A trial court's ruling on a motion to suppress comes to an appellate court "clothed with the presumption of correctness." McNamara v. State, 357 So. 2d 410, 412 (Fla. 1978); see also State v. Triana, 979 So. 2d 1039 (Fla. 3d DCA 2008). While appellate courts must give great deference and a presumption of correctness to a trial court's factual findings if the facts are supported by "competent substantial evidence," the Florida Supreme Court laid out a two-step approach for appellate courts to use when reviewing mixed questions of law and fact that determine constitutional rights: (1) defer to the trial court on questions of historical fact and (2) conduct a *de novo* review of the "mixed questions of law and fact that ultimately determine constitutional issues arising in the context of the Fourth and Fifth Amendment." Connor v. State, 803 So. 2d 598, 605-08 (Fla. 2001); see Wyche v. State, 987 So. 2d 23, 25 (Fla. 2008); State v. Novak, 1 So. 3d 215, 217 (Fla. 5th DCA 2008); State v. Lennon, 963 So. 2d 765, 768 (Fla. 3d DCA 2007).

III.   ANALYSIS

On appeal, Brown argues that the trial court erred in dismissing his motion to suppress. Brown contends that suppression was proper as he had an actual, subjective expectation of privacy in the curtilage of his home and the officers entered the curtilage of his residence without probable cause or any applicable exceptions to the warrant requirement for a search. The State, however, argues that two exceptions to the warrant requirement apply: (1) the officers' entry onto

the property and subsequent actions were part of a valid "knock and talk," and (2) the items seized by the officers fell within the plain view doctrine. We agree with Brown and will address each point separately.

A. ENTRY INTO THE CURTILAGE

We first turn to a significant threshold issue, which the trial court failed to address: whether the curtilage, the area immediately surrounding Brown's home, constitutes an extension of his home, thereby affording it the same Fourth Amendment protections as the home itself. There are four factors that determine the boundaries of the curtilage:

> [T]he proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.

United States v. Dunn, 480 U.S. 294, 301 (1987). "[W]hen it comes to the Fourth Amendment, the home is first among equals. At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.' This right would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity . . . ." Florida v. Jardines, 133 S. Ct. 1409, 1414 (2013) (quoting Silverman v. United States, 365 U.S. 505, 511 (1961)).

Here, it is undisputed that the officers entered the area immediately surrounding and associated with Brown's home, that this area was enclosed by two

6

layers of fencing (each with its own gate), that this area was used as the front and side yard of Brown's residence, and that several "No Trespassing" signs were posted on the outside fence. Pursuant to Jardines, the area entered by the officers was the curtilage of Brown's residence and therefore subject to the same Fourth Amendment protections as Brown's house itself. See Jardines, 133 S. Ct. at 1414 (holding that "area 'immediately surrounding and associated with the home'— what our cases call the curtilage — [is] 'part of the home itself for Fourth Amendment purposes'" (quoting Oliver v. United States, 466 U.S. 170, 180 (1984))).

B. BROWN'S PRIVACY EXPECTATION

Because the area entered by the officers constituted Brown's curtilage and is part of the "home itself for Fourth Amendment purposes," the next question we must address is whether Brown's privacy right in his home was unlawfully infringed. See Katz v. United States, 389 U.S. 347 (1967) (finding that a search occurs within the meaning of the Fourth Amendment when government action infringes an individual's justifiable or reasonable expectation of privacy). A search violates an individual's Fourth Amendment rights only if: (1) a defendant demonstrates that he or she had an actual, subjective expectation of privacy in the property searched; and (2) a defendant establishes that society would recognize that subjective expectation as objectively reasonable. Lennon, 963 So. 2d at 770 (quoting Hicks v. State, 929 So. 2d 13, 16 (Fla. 2d DCA 2006)).

7

In Fernandez v. State, 63 So. 3d 881 (Fla. 3d DCA 2011), this Court held that a defendant established his subjective expectation of privacy in the curtilage of his home by "[p]utting up fences, and affirmatively taking express steps to exclude the public or other persons from using the area, seeing into it, or gaining access to the area . . . ." Id. at 833 (quoting Ratcliff v. State, 783 So. 2d 1099, 1101 (Fla. 5th DCA 2001)). Here, the officers testified that the curtilage to Brown's residence could not be seen from outside the two fences, and that the officers only saw into the curtilage when they took the step of opening the gates to pass through them. Additionally, Brown posted three "No Trespassing" signs on the outside fence, and Brown's mailbox was located on the outside of the first fence. Because the curtilage surrounding Brown's home was not open or viewable to the public and not a place Brown would have reasonably expected the public to enter, we conclude that Brown exhibited an actual, subjective expectation of privacy that society is prepared to recognize as reasonable.

C. VALID KNOCK AND TALK

Notwithstanding Brown's actual, subjective expectation of privacy, the State argues that the trial court's order should be affirmed because the officers' conduct constituted a valid "knock and talk." The State cites to several cases, including Wysong v. State, 614 So. 2d 670 (Fla. 4th DCA 1993). In Wysong, officers ignored "No Trespassing" signs and walked up to the gateless, front door entry to discuss a tip of drug activity. The Fourth District Court of Appeal found that the

8

officers' actions constituted a lawful "knock-and-talk." Id. This case, however, is distinguishable from Wysong. In Wysong, the front door was fully open to public access. In this case, however, Brown's residence was completely fenced and gated, had several "No Trespassing" signs, and his mailbox was located on the outside of the first fence. We have already concluded that Brown held an actual, subjective expectation of privacy, and that his expectation was reasonable.

The State's argument fails to recognize that while the officers were free to approach the outside gate and fence to conduct a "knock and talk," the area inside both the outside fence and the second fence surrounding Brown's side yard has the same Fourth Amendment protections as Brown's house. See Ferrer v. State, 113 So. 3d 860 (Fla. 2d DCA 2012); Fernandez, 63 So. 3d at 883-84.

While this Court has found that a policeman may enter the curtilage surrounding a home in the same way as a salesman or visitor could, no such person would reasonably go through both a gated four-foot fence and a gated six-foot fence, surrounded by several "No Trespassing" signs in order to conduct business with the residents. This Court further finds, contrary to the trial court's order, that the officers did not enter the property in good faith to complete the pending investigation. Indeed, the officers testified that they knew that the investigation into the allegedly stolen vehicle was complete and that the allegedly white stolen vehicle did not match the description of the red getaway vehicle. Lastly, the

9

officers testified that they had no reasonable or articulable basis for questioning Brown about the jewelry store robbery.

D. PLAIN VIEW DOCTRINE

Notwithstanding Brown's expectation of privacy in the curtilage to his residence, the State argues that an officer may enter a protected area without a warrant where the evidence is in "plain view." We conclude, however, that the plain view exception is not applicable under the circumstances of this case.

In order to satisfy the plain view exception, three elements are required: 1) the officer must be in a place where he has a lawful right to be; 2) during his presence the officer inadvertently comes upon an item which is openly visible; and 3) it is immediately apparent to the officer that the object constitutes evidence of a crime. M.L. v. State, 47 So. 3d 911, 912 (Fla. 3d DCA 2010).[1] If an object is presently in plain view, no invasion of privacy will take place from either its observation or its seizure, so long as the police are in an area, lawfully. Horton v. California, 496 U.S. 128, 133, 137 (1990).

Under the plain view exception, it is critical that the officer be in the constitutionally protected area lawfully before recovering items thought to be instrumentalities of a crime. State v. Rickard, 420 So. 2d 303 (Fla. 1982). In Coolidge v. New Hampshire, 403 U.S. 443, 466 (1971), the Supreme Court noted

---

[1] "'[I]mmediately apparent' means that 'at the time the police view the object to be seized, they must have probable cause to believe that the object is contraband or evidence of a crime.'" M.L., 47 So. 3d at 913 (quoting Jones v. State, 648 So. 2d 669, 678 (Fla. 1994)).

10

that the 'plain view exception' may be used if the police have a warrant to search an area and come across some item of incriminating character. If an officer has no prior justification for being in a constitutionally protected area, however, the uncovering of any incriminating evidence is invalid as an illegal seizure. Id.; see also Rimmer v. State, 825 So. 2d 304 (Fla. 2002) (stating that the police may seize items in plain view without a warrant as long as the officers are lawfully in a location where the item is observed and have probable cause to believe the item evidences a crime). For the reasons previously discussed, the officers were not lawfully within the curtilage to Brown's house. Indeed, the officers testified that they saw nothing from outside of Brown's property which justified their initial warrantless entry into the curtilage. As a result, the plain view exception to a warrantless search cannot apply.

The case of Davis v. State, 834 So. 2d 322 (Fla. 5th DCA 2003), is instructive. In that case, the officers entered the residence of a home believed to have been burglarized, but "once the exigency ended," the Fifth District determined that the police could no longer lawfully be in the residence, absent a warrant. Id. at 328. In Davis, instead of leaving the premises, the police seized items, including firearms and jewelry from the premises, arguing the plain view exception based on a suspician that the items were related to criminal activity. Id. The Fifth District reversed the denial of the motion to suppress by the trial court, finding that a "suspicion that the items were connected with criminal activity . . . is

not sufficient for their warrantless seizure" but instead is a violation of the appellant's Fourth Amendment rights. Id. at 328. Here, because Brown erected two fences to keep the public away from his premises, and also placed several "No Trespassing" signs along his property, his subjective expectation of privacy is apparent.

IV. CONCLUSION

Because the officers unlawfully entered the curtilage of Brown's residence and Brown exhibited an actual, subjective expectation of privacy that society is prepared to recognize as reasonable, we vacate the judgment and sentence and remand with instructions that the trial court enter an order suppressing the evidence and for further proceedings consistent with this opinion.

REVERSED AND REMANDED.