INMAN, Judge.
 

 *171
 
 A sign on a rural highway advertising pony rides generally prompts nostalgic thoughts for passing motorists. But a grandfather who noticed such a sign near Arden, North Carolina, found his interest rewarded with gunfire, followed by a series of events giving rise to this appeal.
 

 Defendant David Dwayne Smith ("Defendant"), who resided on the Double "S" Ranch, was convicted of firing into the grandfather's occupied vehicle and other related weapons offenses. He contends that law enforcement officers' entrance into his driveway to investigate the shooting violated his Fourth Amendment protections against unreasonable searches and seizures, and that the trial court therefore erred in denying his motion to suppress evidence gathered as a result of that investigation. After careful review, we affirm the trial court's ruling because at the time of the investigation, Defendant had not revoked the implied license for visitors to approach his home, and the officers' actions did not exceed the scope of a lawful "knock and talk."
 

 Factual and Procedural History
 

 On the afternoon of 30 July 2013, Danny Wilson ("Mr. Wilson") drove his two adult children and a family friend to 2516 Hendersonville Road in Arden, where he had seen a sign advertising "pony rides," to inquire about a ride for his grandson. The pony ride sign, which listed a phone number, was located near the edge of Hendersonville Road and could be seen from the road. Defendant and his wife, Brenda Smith ("Mrs.
 

 *506
 
 Smith"), resided at that address. The property was known as the Double "S" Ranch.
 
 [1]
 

 A gate consisting of a piece of wire stock fencing separated Defendant's driveway and Hendersonville Road. Mr. Wilson and his passengers ("the Wilsons") observed a "No Trespassing" sign affixed to the gate. Mr. Wilson pulled off to the side of Hendersonville Road, just onto Defendant's driveway but outside the gate, and dialed the phone number listed on the sign.
 

 *172
 
 While Mr. Wilson placed the call, the passengers in his car heard a " pop" or "thump" noise. They observed a white male approximately 100 yards away from the road, holding what appeared to be a rifle, which they believe the male fired. The Wilsons left the premises and drove to a store to shop. When they returned to the car, they noticed a flat or nearly flat tire, so they drove to a tire store. Shortly thereafter, while the Wilsons were in a restaurant, the manager of the tire store came and showed them a small-caliber bullet that had been found in the flat tire during the repair. The tire store manager gave Mr. Wilson the bullet. Mr. Wilson then contacted the Asheville Police Department, which referred the matter to the Buncombe County Sheriff's Office.
 

 The following day, 31 July 2013, Buncombe County Detectives Walt Thrower ("Detective Thrower") and Benjamin McKay ("Detective McKay") (collectively "the detectives") interviewed the Wilsons at Mr. Wilson's home. In separate interviews, each of the four witnesses gave the same account of the previous day's events. The detectives then went to the tire shop, where they interviewed the manager. Based on these interviews, the detectives drove to Defendant's property.
 

 When they arrived at Defendant's property, Detective Thrower saw the pony ride sign and called the number listed to no avail. The gate was open. The detectives did not recall observing the "No Trespassing" sign the passengers had reported seeing the previous day.
 

 The detectives, who were armed with pistols, put on bulletproof vests bearing the word "Sheriff" over their plain clothes and called for a uniformed deputy in a marked patrol car to accompany them onto the property. Once the uniformed deputy arrived, both the detectives' car and the marked patrol car drove through the open gate and onto the driveway leading to Defendant's residence. The detectives parked in a parking area beside another vehicle, which was later identified as Defendant's, but they stayed in their car because a large dog was running around. The uniformed deputy remained in his patrol car behind the detectives' car.
 

 Defendant came out of the house, which was visible from the driveway, and spoke with the detectives, who at that time exited their vehicle and remained in the driveway. During this initial encounter, Defendant denied having any knowledge of a shooting on his property the previous day. When asked what he had been doing the day before, Defendant invited the detectives and the deputy to see some animal pens he was working on behind the house. When they returned to the driveway, the detectives asked Defendant if he owned any guns. Defendant told them
 
 *173
 
 he owned an "air soft" gun, a non-lethal weapon that shoots plastic pellets. He denied owning a rifle.
 

 Shortly thereafter, Mrs. Smith walked out of the house and spoke to Detective McKay. She told him that there was a .22 caliber rifle inside the residence. Detective Thrower asked Defendant for permission to search the residence for the rifle; Defendant gave his verbal consent. Subsequently, Detective Thrower drafted a handwritten consent form, which he asked Mrs. Smith to sign. Mrs. Smith initially expressed hesitation and asked whether she and Defendant should speak to a lawyer, but after conferring separately with Defendant, she signed the consent form.
 

 According to Detective McKay, during the time when Detective Thrower was drafting the handwritten consent and then speaking
 
 *507
 
 separately with Mrs. Smith, Detective McKay told Defendant, "this [incident] could have been a lot worse because nobody got hurt," to which Defendant replied, "[the passengers] didn't get hurt because I didn't mean them to get hurt. I hit what I shot at." While still in the driveway, Defendant wrote and signed a statement saying he "aimed at the right front tire of [Mr. Wilson's] truck and struck it."
 

 Detective McKay searched Defendant's house and found a .22 caliber rifle with a scope as well as another shotgun. Detective McKay seized the rifle and then prepared a handwritten receipt, which Defendant signed. The detectives and uniformed deputy then left Defendant's home. As Detective Thrower was getting into the car, Defendant commented that Detective Thrower's bulletproof vest would "only stop[ ] up to a .45 [caliber bullet] and that would not do [Detective Thrower] any good." At this time, Defendant was not arrested, confined, advised of his rights, or charged with a crime. The detectives were present on Defendant's property for a total of approximately 40 to 45 minutes.
 

 After leaving Defendant's residence, Detective Thrower ran a criminal background check on Defendant that revealed prior felony convictions from Texas. Based on Defendant's convicted felon status and the detectives' interaction with him, the detectives applied for a search warrant to retrieve the other gun that Detective McKay had observed in Defendant's home. The detectives also obtained an arrest warrant charging Defendant with various offenses including firing a .22 caliber rifle into an occupied vehicle in operation and unlawful firearm possession. Based on Defendant's criminal history, known possession of a firearm, and his comment to Detective Thrower about the bulletproof vest (which was perceived as a threat), the detectives' supervisors recommended that a SWAT team accompany them to Defendant's home to execute the warrants.
 

 *174
 
 On 1 August 2013, the SWAT team arrived at Defendant's residence. The driveway gate was closed. Instead of a "No Trespassing" sign like the one the Wilsons described seeing on 30 July 2013, there was a sign on the gate warning, "Trespassers will be shot!!! Survivors will be shot again!!!" The SWAT team drove through the gate in an armored vehicle. While searching Defendant's residence, officers found multiple firearms including a shotgun, a Russian style sniper rifle, and a black powder muzzle-loading rifle. At the time the officers were executing the search warrant, Defendant was arrested by different officers away from his residence.
 

 On 4 November 2013, Defendant was indicted for the following offenses: discharging a weapon into an occupied vehicle in operation; possession of a firearm by felon (three counts); and having attained the status of a habitual felon (three counts). On 23 June 2014, Defendant filed in Buncombe County Superior Court a motion to suppress all evidence obtained during the detectives' first visit to the property and the evidence procured by the search warrant the following day. Judge William H. Coward denied Defendant's motion to suppress.
 

 On 19 August 2014, before Judge Marvin P. Pope Jr., Defendant pled guilty to the charged offenses while preserving his right to appeal the denial of the suppression motion. Defendant was sentenced, as a prior record level III offender, to an active term of imprisonment lasting from 96 months to 128 months. Defendant gave notice of appeal in open court.
 

 Analysis
 

 I. Appellate Jurisdiction
 

 As an initial matter, we must address the issue of whether appellate jurisdiction exists over Defendant's appeal. Rule 4 of the North Carolina Rules of Appellate Procedure provides that a defendant may appeal a judgment or order rendered in a criminal action by giving oral notice of appeal at trial. N.C. R.App. P. 4(a).
 

 On 20 August, the day after Defendant pled guilty to the charged offenses, Defendant's trial counsel gave oral notice of appeal, stating that Defendant was "giving notice of appeal in court to the North Carolina Court of Appeals of the denial of the suppression motion." Because Defendant's trial counsel
 
 *508
 
 did not state that Defendant was appealing from the judgment of conviction, but only from the suppression motion, the notice of appeal was deficient.
 
 See
 

 State v. Miller,
 

 205 N.C.App. 724
 
 , 725,
 
 696 S.E.2d 542
 
 , 542 (2010) ("Defendant has failed to appeal from the judgment of conviction and our Court does not have jurisdiction to
 
 *175
 
 consider Defendant's appeal."). Recognizing the deficiency in his notice of appeal, Defendant filed a petition for writ of certiorari asking this Court to review the 20 August 2014 judgment of conviction. The State concedes that "it is clear that [D]efendant was attempting to notice his appeal of the judgment." In light of the fact Defendant intended to appeal the judgment, we exercise our discretion and allow the petition for writ of certiorari.
 
 See
 
 N.C. R.App. P. 21(a)(1) ;
 
 see also
 

 State v. McCoy,
 

 171 N.C.App. 636
 
 , 638,
 
 615 S.E.2d 319
 
 , 320 (2005) ( "While this Court cannot hear defendant's direct appeal [for failure to properly give notice of appeal], it does have the discretion to consider the matter by granting a petition for writ of
 
 certiorari.
 
 ").
 

 II. Motion to Suppress
 

 In its order denying Defendant's motion to suppress, the trial court made the following pertinent conclusions:
 

 14. After considering and weighing these factors, this court concludes that the curtilage of Defendant's house did not extend to the gate.
 

 15. The Court further concludes that the curtilage did not extend into the driveway, where the detectives initiated their investigations, and generally where the interactions of the parties occurred.
 

 16. Even if the curtilage can be extended out into the open driveway area, the Court concludes that the actions of the detectives and the deputy were the equivalent of a "knock and talk" encounter and did not violate the Fourth Amendment.
 

 Defendant challenges the trial court's conclusion that "the actions of the detectives and deputy were the equivalent of a 'knock and talk' encounter and did not violate the Fourth Amendment." Specifically, Defendant contends the investigation was unlawful because the detectives had no implied license to enter Defendant's property and because the detectives exceeded the general inquiry within the limits of a lawful "knock and talk." Defendant also challenges the trial court's conclusion that "the curtilage did not extend into the driveway, where the detectives initiated their investigations, and generally where the interactions of the parties occurred." We reject Defendant's arguments and hold that the detectives did not violate the Fourth Amendment in entering Defendant's property by way of his driveway to ask questions about the previous day's shooting.
 

 *176
 
 In our review of trial court orders addressing motions to suppress,
 

 the trial court's findings of fact are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting. This Court must not disturb the trial court's conclusions if they are supported by the trial court's factual findings. However, the trial court's conclusions of law are fully reviewable on appeal.
 

 State v. Harwood,
 

 221 N.C.App. 451
 
 , 454-55,
 
 727 S.E.2d 891
 
 , 895-96 (2012) (internal quotation marks and citations omitted).
 

 The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "The Fourth Amendment indicates with some precision the places and things encompassed by its protections: persons, houses, papers, and effects."
 
 Florida v. Jardines,
 
 569 U.S. ----, ----,
 
 133 S.Ct. 1409
 
 , 1414,
 
 185 L.Ed.2d 495
 
 , 501 (2013) (internal quotation marks and citations omitted). "At the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."
 
 Silverman v. United States,
 

 365 U.S. 505
 
 , 511,
 
 81 S.Ct. 679
 
 , 683,
 
 5 L.Ed.2d 734
 
 , 739 (1961).
 

 The United States Supreme Court has articulated two tests for assessing a search under the Fourth Amendment: the reasonable expectation of privacy test based on Justice Harlan's concurrence in
 
 *509
 

 Katz v. United States,
 

 389 U.S. 347
 
 , 360,
 
 88 S.Ct. 507
 
 , 516,
 
 19 L.Ed.2d 576
 
 , 587 (1967), and the "trespassory test" employed in
 
 United States v. Jones,
 
 565 U.S. ----, ----,
 
 132 S.Ct. 945
 
 , 952,
 
 181 L.Ed.2d 911
 
 , 920-21 (2012), and
 
 Jardines,
 
 569 U.S. at ----,
 
 133 S.Ct. at 1421
 
 ,
 
 185 L.Ed.2d at 503-04
 
 .
 

 In
 
 Katz v. United States,
 

 389 U.S. 347
 
 , 351,
 
 88 S.Ct. 507
 
 , 511,
 
 19 L.Ed.2d 576
 
 , the Supreme Court held that the government conduced an unreasonable Fourth Amendment search by placing an electronic listening device outside of a public telephone booth. "As Justice Harlan's oft-quoted concurrence [in
 
 Katz
 
 ] described it, a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable."
 
 Kyllo v. United States,
 

 533 U.S. 27
 
 , 33,
 
 121 S.Ct. 2038
 
 , 2042,
 
 150 L.Ed.2d 94
 
 , 101 (2001).
 

 In
 
 Jones,
 
 the Supreme Court held that the government's installation of a GPS device on a target's vehicle and use of the GPS device to monitor the vehicle's movements constituted a Fourth Amendment search. 565 U.S. at ----,
 
 132 S.Ct. at 951
 
 ,
 
 181 L.Ed.2d at 919
 
 . Noting that "our Fourth Amendment jurisprudence was tied to common-law trespass, at least until the latter
 
 *177
 
 half of the 20th century[,]"
 

 id.
 

 at ----,
 
 132 S.Ct. at 949
 
 ,
 
 181 L.Ed.2d at 918
 
 , the
 
 Jones
 
 Court held that "the
 
 Katz
 
 reasonable-expectation-of-privacy test has been added to, not substituted [by], the common-law trespassory test."
 

 Id.
 

 at ----,
 
 132 S.Ct. at 952
 
 ,
 
 181 L.Ed.2d at 921
 
 . In
 
 Jardines,
 
 569 U.S. at ----,
 
 133 S.Ct. at 1426
 
 ,
 
 185 L.Ed.2d at 502
 
 , the Supreme Court held that law enforcement officers' use of a drug-sniffing dog on the front porch of a home to investigate a tip that marijuana was being grown inside was a physical intrusion of the curtilage which constituted a "search" for Fourth Amendment purposes. The Supreme Court explained that officers "gathered that information by physically entering and occupying the area to engage in conduct not explicitly or implicitly permitted by the homeowner."
 

 Id.
 

 at ----,
 
 133 S.Ct. at 1414
 
 ,
 
 185 L.Ed.2d at 502
 
 . The Supreme Court held that there is an implied license for visitors to " approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave."
 

 Id.
 

 A police officer, like any other private citizen, may accept this implied invitation and approach the home by the front path.
 

 Id.
 

 Accordingly, in North Carolina, law enforcement officers may approach a front door to conduct "knock and talk" investigations that do not rise to the level of a Fourth Amendment search.
 
 See
 

 State v. Tripp,
 

 52 N.C.App. 244
 
 , 249,
 
 278 S.E.2d 592
 
 , 596 (1981) ("Law enforcement officers have the right to approach a person's residence to inquire as to whether the person is willing to answer questions.") (internal citations omitted);
 
 see also
 

 State v. Church,
 

 110 N.C.App. 569
 
 , 573-74,
 
 430 S.E.2d 462
 
 , 465 (1993) ( "[W]hen officers enter private property for the purpose of a general inquiry or interview, their presence is proper and lawful.... [O]fficers are entitled to go to a door to inquire about a matter; they are not trespassers under these circumstances.") (internal quotation marks and citation omitted).
 

 A. Implied License
 

 Defendant argues that the "No Trespassing" sign on his gate "expressly removed" the implied license to approach his home, and thus "any information gathered by the officers following their warrantless entry onto the property should [have been] suppressed." We disagree because the sign alone, particularly in the context of other relevant facts, was insufficient to revoke the implied license to approach.
 

 As recognized by
 
 Jardines,
 
 the implied license to approach a home is not absolute.
 
 State v. Grice,
 

 367 N.C. 753
 
 , 762,
 
 767 S.E.2d 312
 
 , 319 (2015) (citing
 
 Jardines,
 
 569 U.S. at ----,
 
 133 S.Ct. at 1423
 
 ,
 
 185 L.Ed.2d at
 
 502 ). Provided that the homeowner displays "clear demonstrations" of his intent, the license to approach the home may be limited or rescinded entirely.
 

 Id.
 

 *178
 
 The dispositive question is whether, at the time of the approach by law enforcement officers, Defendant had made the requisite " clear demonstration" that the license to enter his property has been rescinded.
 

 Id.
 

 Prior to
 
 Jardines,
 
 this Court held that the presence of a "No Trespassing" sign on its
 
 *510
 
 own is not dispositive for Fourth Amendment analysis.
 
 State v. Pasour,
 

 223 N.C.App. 175
 
 , 178-79,
 
 741 S.E.2d 323
 
 , 326 (2012) ( "Further, while not dispositive, a homeowner's intent to keep others out ... may be demonstrated by the presence of 'no trespassing' signs."). Moreover, while a few jurisdictions in the wake of
 
 Jardines
 
 have reached mixed results in interpreting when and how revocation may occur, we are not aware of any court that has ruled that a sign alone was sufficient to revoke the implied license to approach.
 
 See, e.g.,
 

 United States v. Bearden,
 

 780 F.3d 887
 
 , 893-94 (8th Cir.2015) ("knock and talk" upheld where officers entered property through open driveway gate marked with "No Trespassing" signs);
 
 United States v. Denim,
 
 No. 2:13-CR-63,
 
 2013 WL 4591469
 
 , at *2-6 (E.D.Tenn. Aug. 28, 2013) (six "No Trespassing" signs not sufficient to revoke implied license). Courts in other jurisdictions have ruled that the implied invitation to approach was revoked by homeowners who sought refuge behind a large, imposing fence and made clear by either verbal or posted instructions that visitors were not welcome.
 
 See
 

 Bainter v. State,
 

 135 So.3d 517
 
 , 519 (Fla. 5th DCA 2014) (license revoked by presence of six foot chain link gate within barbed wire fence, accompanied by "No Trespassing" signs);
 
 Brown v. State,
 

 152 So.3d 619
 
 , 622-24 (Fla. 3d DCA 2014) (license revoked by presence of two concentric chain link fences around property, "No Trespassing" signs on outer fence, and verbal request to leave by owner);
 
 Robinson v. State,
 

 164 So.3d 742
 
 , 742-44 (Fla. 2d DCA 2015) (license revoked by closed chain-link fence bearing both "No Trespassing" and "Beware of Dog" signs).
 

 Here, it is not established that Defendant consistently displayed a "No Trespassing" sign on his property. While the trial court found that there was indeed such a sign present on 30 July, the trial court did not find that the sign was present on 31 July, the day law enforcement officers first visited the property.
 

 Moreover, there is no evidence that Defendant took consistent steps to physically prevent visitors from entering the property. The "gate" consisted of wire mesh stretched across two poles on either side of the driveway. At no time during the initial encounter with the Wilsons or the investigation into the shooting did this gate bear a lock or any other form of locking mechanism. While the gate was closed when the Wilsons approached on 30 July, it was open when the detectives arrived on 31 July.
 

 *179
 
 Finally, Defendant's conduct upon the detectives' arrival belied any notion that their approach was unwelcome. When the detectives and the uniformed deputy entered his driveway, Defendant emerged from his home and " greeted the detectives and deputy," and after an initial conversation about the shooting incident, Defendant "voluntarily led the detectives and the deputy around to the rear of the residence" where they discussed Defendant's work (building animal pens), the weapons he owned (putatively an "air-soft" gun), and his livestock. Thus, rather than avoiding the detectives, which he was entitled to do, or requesting that they leave his property, Defendant engaged them in what the record reflects was a calm, civil discussion. Defendant's actions therefore did not reflect a "clear demonstration" of an intent to revoke the implied license to approach.
 

 B. Scope and Purpose of "Knock and Talk
 
 "
 

 Defendant contends the "knock and talk" was not lawful because the detectives' actions exceeded the scope of a general inquiry. We disagree.
 

 Generally, "[i]t is well established that entrance by law enforcement officers onto private property for the purpose of a general inquiry or interview is proper."
 
 State v. Gentile,
 
 --- N.C.App. ----, ----,
 
 766 S.E.2d 349
 
 , 353 (2014). "[T]he scope of a license is limited not only to a particular area but also to a specific purpose."
 
 Jardines,
 
 569 U.S. at ----,
 
 133 S.Ct. at 1412
 
 ,
 
 185 L.Ed.2d at 499
 
 .
 

 On 31 July, after speaking with the Wilsons and the manager of the tire store, the detectives entered Defendant's property to inquire about the reported shooting the prior day. Because they were investigating a shooting, the detectives wore bulletproof vests and were accompanied by a marked patrol car and uniformed deputy. The detectives
 
 *511
 
 and deputy drove in daylight through Defendant's open gate and onto his driveway. The detectives' vests, worn over their clothing, plainly displayed the word "Sheriff" and they made no attempt to conceal the fact that they were law enforcement officers. In fact, when Defendant came out of his house and greeted the detectives in the driveway, they identified themselves and showed Defendant their badges.
 

 Unlike the facts of
 
 Jardines,
 
 569 U.S. at ----,
 
 133 S.Ct. at 1416
 
 ,
 
 185 L.Ed.2d at 502-03
 
 , in which officers introduced a trained police dog to explore the area beyond the home without the resident's consent, the detectives' actions in the present case did not reflect any purpose beyond basic questioning. The detectives only departed from Defendant's driveway and ventured further onto his property after Defendant expressly invited them to the
 
 *180
 
 rear of his house to see his animal pens. The detectives entered the home only after Mrs. Smith stated that there was, in fact, a rifle in the home and after receiving consent from both Defendant and Mrs. Smith. Defendant did not request that the officers leave his property at any time. Moreover, the detectives' questions regarding whether there were guns in Defendant's home were both reasonable and germane to the purpose of the visit, which was to make a general inquiry about a reported shooting on the property.
 

 C. Curtilage
 

 Defendant challenges the trial court's conclusion that "the curtilage did not extend into the driveway, where the detectives initiated their investigations, and generally where the interactions of the parties occurred." Defendant contends that "[h]ad the trial court properly concluded that the areas immediately around [Defendant's] home were within the curtilage, [Defendant] would have been afforded the Fourth Amendment protections which were his due. The detectives' unlawful entry into and through [Defendant's] curtilage would have, therefore, violated the Fourth Amendment." We disagree.
 

 This issue relates to the expectation-of-privacy theory of Fourth Amendment jurisprudence. "Because an individual ordinarily possesses the highest expectation of privacy within the curtilage of his home, that area typically is afforded the most stringent Fourth Amendment protection."
 
 State v. Lupek,
 

 214 N.C.App. 146
 
 , 151,
 
 712 S.E.2d 915
 
 , 919 (2011) (internal quotation marks and citations omitted). "[T]he curtilage is the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life, and therefore has been considered part of home itself for Fourth Amendment purposes."
 
 Oliver v. United States,
 

 466 U.S. 170
 
 , 180,
 
 104 S.Ct. 1735
 
 , 1742,
 
 80 L.Ed.2d 214
 
 , 225 (1984) (internal citation and quotation marks omitted).
 
 [2]
 
 However, our Court has held:
 

 [N]o search of the curtilage occurs when an officer is in a place where the public is allowed to be, such as at the front door of a house. It is well established that entrance by law enforcement officers onto private property for the purpose of a general inquiry or interview is proper.
 

 *181
 

 Gentile,
 
 --- N.C.App. at ----,
 
 766 S.E.2d at 353
 
 (internal quotation marks and citations omitted).
 

 Here, the trial court concluded that, "[e]ven if the curtilage can be extended out into the open driveway area ... the actions of the detectives and deputy were the equivalent of a 'knock and talk' encounter and did not violate the Fourth Amendment." The trial court found that "[t]he Smith property is traversed by a private, unpaved driveway off of Hendersonville Road, which leads to the 'Smith House.' " The driveway served as an access route to the front door, an area detectives were lawfully able to approach to conduct a "knock and talk."
 
 See
 

 Grice,
 

 367 N.C. at 761
 
 ,
 
 767 S.E.2d at 318
 
 ("The officers in this case were, by the custom and tradition
 
 *512
 
 of our society, implicitly invited into the curtilage to approach the home."). By entering the gate and driving down the driveway, the detectives and deputy did not deviate from the area where their presence was lawful, and thus, did not violate the Fourth Amendment.
 

 Conclusion
 

 Because law enforcement officers did not violate Defendant's rights protected by the Fourth Amendment, we affirm the trial court's order denying the motion to suppress.
 

 AFFIRMED.
 

 Judges CALABRIA and STROUD concur.
 

 [1]
 

 Another sign near the pony rides sign and visible from the highway was labeled "Double 'S' Ranch" and advertised "Riding Lessons, Lead-Line Rides and Temp[orary] Boarding." That sign listed the same phone number as the pony rides sign. Defendant owns the property jointly with his wife and other members of her family.
 

 [2]
 

 The protection afforded to curtilage under the privacy interest of Fourth Amendment is determined by looking at four factors: "[1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by."
 
 United States v. Dunn,
 

 480 U.S. 294
 
 , 301,
 
 107 S.Ct. 1134
 
 , 1139,
 
 94 L.Ed.2d 326
 
 , 334-35 (1987).