ARROWOOD, Judge.
 

 *914
 

 *116
 
 Shawn Patrick Ellis ("defendant") appeals the denial of his motion to suppress, and from a judgment entered based upon his guilty pleas to manufacturing marijuana, attempted trafficking of marijuana, possession of drug paraphernalia, possession with intent to sell and deliver marijuana, and maintaining a dwelling house for keeping and selling a controlled substance. Those pleas were entered pursuant to
 
 North Carolina v. Alford
 
 ,
 
 400 U.S. 25
 
 ,
 
 91 S.Ct. 160
 
 ,
 
 27 L. Ed. 2d 162
 
 (1970) (hereinafter, " Alford plea"). For the following reasons, we reverse.
 

 I.
 
 Background
 

 On 9 September 2014, Cabarrus County Sheriff's Detectives Helms ("Detective Helms") and Kevin Klinglesmith ("Detective Klinglesmith") responded to a home off NC Highway 49 in reference to a felony larceny report involving the theft of a Bobcat earth moving equipment. The officers located the equipment at the home, and were informed by a witness there that the person who had stolen the equipment was at a house "across the street[.]" The house belonged to defendant.
 

 The officers parked across the street from defendant's house and walked along the wood line to the right of the driveway. Detective Klinglesmith testified that the driveway was on the right side of the home, and the front door of the residence was "further to the right half" and was the door closest to the road. Detective Helms went to the front door and knocked, but no one responded. He noticed there was a large spider web present in the door frame.
 

 Detective Klinglesmith went around to the right rear of the house behind the residence. He testified that he went to the rear of the house because the detectives were dealing with a felony suspect, and he believed the backyard was an access point, due to vehicles along the right side to the rear of the residence. There were no visible gates or "No Trespassing" signs surrounding the residence.
 

 *117
 
 Detective Helms failed to get a response at the front door after knocking for several minutes, however, he saw a curtain in the front window move. Detective Helms radioed Detective Klinglesmith to tell him the curtain moved, and Detective Klinglesmith began to knock at the rear door for several minutes. He was also unsuccessful at getting anyone to answer the door.
 

 When Detective Klinglesmith did not hear anything from the back of the house, or see anyone inside the home, he walked to the front yard near the left front corner of the residence. He still did not see or hear anyone from that vantage point. However, he was able to smell the odor of marijuana. Detective Klinglesmith called Detective Helms over to the front of the house and asked him if he noticed anything odd. Detective Helms also smelled marijuana.
 

 Detective Klinglesmith heard a loud fan coming from a crawl space area and noticed the odor of the marijuana from that area. He noticed a light illuminating from a padlocked crawl space area. He testified that he "put [his] eye up to it without touching it ... [he] could see between the slats" and observed what he believed to be a marijuana plant in a bucket inside the crawlspace. The detectives contacted vice and narcotics officers. Detective D.J. Miller of the Cabarrus County Sheriff's Office applied for and received a warrant authorizing the search of defendant's residence based solely upon the information obtained from Detectives Klinglesmith and Helms. The search warrant was issued at 11:25 a.m. and was executed within the hour. Various drugs and drug paraphernalia were seized from the premises.
 

 On 29 September 2014, defendant was charged with manufacturing marijuana, trafficking in marijuana, possessing drug paraphernalia, possessing marijuana with intent to sell or deliver, maintaining a dwelling used
 
 *915
 
 for keeping and selling a controlled substance, and trafficking in opiates.
 

 Prior to trial, defendant filed a motion to suppress "all evidence of any kind" including seized drugs, statements of the defendant, or any other witnesses present at the time of the search. A hearing was held on 10 May 2017 before the Honorable Martin B. McGee in Cabarrus County Superior Court. On 3 April 2018, the court issued a written order denying the motion. The pertinent findings of fact are as follows:
 

 4. Detective Helms knocked numerous times at the front door but was unable to make contact with anyone inside the residence. ...
 

 *118
 
 5. After no contact was made knocking at the front door, Detective Helms noticed the front window curtain move. When that information was communicated to Detective Klinglesmith by radio, Detective Klinglesmith walked back up to the front of the residence. While Detective Helms was still trying to make contact, Detective Klinglesmith walked to the front yard near the left front corner of the [sic] to observe the unfolding situation. At that point, Detective Klinglesmith detected an odor of marijuana.
 

 6. Detective Helms also independently noticed an odor of marijuana. While Detective Klinglesmith was standing on the side of the residence, he also heard a loud fan coming from the crawlspace area and noticed that the air conditioning units were off. He noted that the odor of marijuana was coming from that area. He also noticed a light on in the crawlspace area where the [marijuana] odor was emanating. There were two wooden doors with cracks that allowed Detective Klinglesmith to see inside without manipulating the doors. He observed in plain view a white five gallon bucket with a green leafy plant that was suspected to be marijuana. Detective Klinglesmith alerted Detective Helms and they left the premises to obtain a search warrant.
 

 Based upon these findings of fact, the court made eight conclusions of law, including that:
 

 6. ... What the detectives smelled and saw given its exposure was not detected as part of a search. The smells and observations were in plain smell or view from locations in which the detectives had a right to be given all of the circumstances in this case.
 

 Defendant, after reserving his right to appeal, entered
 
 Alford
 
 pleas to all but one of the charges. Following entry of judgment, defendant filed a written notice of appeal.
 

 II.
 
 Discussion
 

 Defendant argues the trial court erred in denying his motion to suppress because the court failed to take into account the limitations that apply when law enforcement officials enter private property to acquire
 
 *119
 
 information. We agree. Pursuant to the precedent established by the United States Supreme Court in
 
 Florida
 

 v. Jardines,
 

 569 U.S. 1
 
 ,
 
 133 S.Ct. 1409
 
 ,
 
 185 L. Ed. 2d 495
 
 (2013), as applied by recent decisions of this Court, we hold that the search without a warrant violated defendant's rights under the Fourth Amendment to the Constitution of the United States. Therefore, the trial court erred in denying defendant's motion to suppress the evidence seized pursuant to the search warrant.
 

 Our review of a trial court's denial of a motion to suppress is "strictly limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law."
 
 State v. Cooke
 
 ,
 
 306 N.C. 132
 
 , 134,
 
 291 S.E.2d 618
 
 , 619 (1982). "The trial court's conclusions of law are reviewed
 
 de novo
 
 [.]"
 
 State v. Franklin
 
 ,
 
 224 N.C. App. 337
 
 , 346,
 
 736 S.E.2d 218
 
 , 223 (2012),
 
 aff'd by an equally divided court
 
 ,
 
 367 N.C. 183
 
 ,
 
 752 S.E.2d 143
 
 (2013) (quotations and citation omitted).
 

 "The fourth amendment as applied to the states through the fourteenth amendment protects citizens from unlawful searches and seizures committed by the government or its agents."
 
 State v. Sanders,
 

 327 N.C. 319
 
 , 331,
 
 395 S.E.2d 412
 
 , 420 (1990),
 
 *916
 

 cert. denied,
 

 498 U.S. 1051
 
 ,
 
 111 S.Ct. 763
 
 ,
 
 112 L. Ed. 2d 782
 
 (1991) (citation omitted).
 

 [W]hen it comes to the Fourth Amendment, the home is first among equals. At the Amendment's very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion. This right would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity; the right to retreat would be significantly diminished if the police could enter a man's property to observe his repose from just outside the front window.
 

 Jardines
 
 ,
 
 569 U.S. at 6
 
 ,
 
 133 S.Ct. at
 
 1414
 
 185 L. Ed. 2d at 501
 
 (internal citation and quotations omitted). North Carolina has extended this "first among equals" protection to the curtilage.
 
 State v. Rhodes
 
 ,
 
 151 N.C. App. 208
 
 , 214,
 
 565 S.E.2d 266
 
 , 270,
 
 writ denied, review denied
 
 ,
 
 356 N.C. 173
 
 ,
 
 569 S.E.2d 273
 
 (2002).
 

 The curtilage concept originated at common law to extend to the area immediately surrounding a dwelling house the same protection under the law of burglary as was afforded the house itself. [T]he curtilage is the area to which
 
 *120
 
 extends the intimate activity associated with the sanctity of a man's home and the privacies of life, and therefore has been considered part of the home itself for Fourth Amendment purposes. In North Carolina, curtilage of the home will ordinarily be construed to include at least the yard around the dwelling house as well as the area occupied by barns, cribs, and other outbuildings.
 

 Id
 
 . (internal quotations and citations omitted) (alteration in original).
 

 In the present case the undisputed evidence establishes that all the facts, which formed the basis for the search warrant, were obtained while the officers were within the curtilage of defendant's home. The State relies upon the "knock and talk" exception in an attempt to salvage the actions of the detectives. It argues that the detective's actions in going around to the back door and to the left corner of the house were justified because those actions were an extension of a "knock and talk."
 

 "Knock and talk" is a procedure utilized by law enforcement officers to obtain a consent to search when they lack the probable cause necessary to obtain a search warrant. That officers approach a residence with the intent to obtain consent to conduct a warrantless search and seize contraband does not taint the consent or render the procedure
 
 per se
 
 violative of the Fourth Amendment.
 

 State v. Smith
 
 ,
 
 346 N.C. 794
 
 , 800,
 
 488 S.E.2d 210
 
 , 214 (1997). A knock and talk "implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave."
 
 Jardines
 
 ,
 
 569 U.S. at 8
 
 ,
 
 133 S.Ct. at 1415
 
 ,
 
 185 L. Ed. 2d at 502
 
 (internal quotations and citations omitted).
 

 In
 
 Jardines
 
 , the United States Supreme Court held that officers conducted a search within the meaning of the Fourth Amendment when they attempted a knock and talk at a residence, but also brought a forensic narcotics dog onto the defendant's property to explore the areas around the home.
 
 Id
 
 . at 11-12,
 
 133 S.Ct. at 1417-18
 
 ,
 
 185 L. Ed. 2d at 504
 
 . Thus, the evidence the trained police dog discovered was inadmissible because "the officers learned what they learned only by physically intruding on Jardines' property to gather evidence[.]"
 
 Id
 
 . at 11,
 
 133 S.Ct. at 1417
 
 ,
 
 185 L. Ed. 2d at 504
 
 .
 

 In the instant case, while there was no police dog accompanying the officers, the same standards apply. The detectives were not permitted to roam the property searching for something or someone after attempting a failed "knock and talk." Without a warrant, they could only "approach
 
 *121
 
 the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave."
 
 Id
 
 . at 8,
 
 133 S.Ct. at 1415
 
 ,
 
 185 L. Ed. 2d at 502
 
 .
 

 Here, the detectives overstayed their "knock and talk" welcome on the property. Detective Helms knocked on the front door, but, when no one answered, he remained. Further, Detective Klinglesmith walked around to the rear door and then to the left front corner of the yard. By moving away from the front door, and entering the sides of
 
 *917
 
 defendant's yard and approaching the back door, Detective Klinglesmith was moving into the curtilage of defendant's home without a warrant.
 

 North Carolina courts have consistently applied these principles. For example, in
 
 State v. Huddy
 
 , --- N.C. App ----,
 
 799 S.E.2d 650
 
 , (2017), an officer was investigating a possible break-in and declined to knock on the front door as it was "covered in cobwebs and did not appear to be used as the main entrance to the house."
 

 Id.
 

 at ----,
 
 799 S.E.2d at 653
 
 . The officer then "cleared" the sides of the house, opened a gate to a chain link fence in the backyard and approached a storm door not visible from the street, where he smelled marijuana.
 
 Id
 
 . This Court found that a search had occurred, as "law enforcement may not use a knock and talk as a pretext to search the home's curtilage[,]" and this doctrine "does not permit law enforcement to approach
 
 any
 
 exterior door to a home."
 
 Id
 
 . at ----,
 
 799 S.E.2d at 654
 
 (internal quotations and citation omitted) (emphasis in original). An officer may only knock at the door that a "reasonably respectful citizen" unfamiliar with the home would believe is the door at which to knock.
 
 Id
 
 . He or she may not subjectively choose an alternate door, even if there are cobwebs on the front door.
 

 This Court reached a similar conclusion in
 
 State v. Stanley
 
 , --- N.C. App. ----,
 
 817 S.E.2d 107
 
 (2018).
 
 Stanley
 
 considered the legality of a knock and talk where officers walked into the backyard and knocked on the back door, rather than the front door, because they had seen an informant purchasing drugs at the back door.
 
 Id
 
 . at ----,
 
 817 S.E.2d at 109
 
 . "[T]he fact that the resident of a home may choose to allow certain individuals to use a back or side door does not mean that similar permission is deemed to have been given generally to members of the public."
 
 Id
 
 . at ----,
 
 817 S.E.2d at 113
 
 . In contrast, in
 
 State v. Grice
 
 ,
 
 367 N.C. 753
 
 ,
 
 767 S.E.2d 312
 
 (2015), officers were lawfully permitted to use a door other than the front door for a knock and talk, in that case that front door was "inaccessible, covered with plastic, and obscured by furniture" and the side door "appeared to be used as the main entrance."
 
 Id
 
 . at 754,
 
 767 S.E.2d at 314
 
 .
 

 *122
 
 Here, defendant's front door was not obscured or covered with plastic. Instead, there was a cobweb. Per the trial court's findings of fact, "Detective Helms knocked numerous times at the front door but was unable to make contact" and observed a curtain beside the front door move. Neither of these facts constitutes an invitation to remain. If anything, these facts support the reasonable conclusion that the occupant saw the detectives outside and did not wish to speak with them, as is his right.
 

 When law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do. And whether the person who knocks on the door and requests the opportunity to speak is a police officer or a private citizen, the occupant has no obligation to open the door or to speak.
 

 Kentucky v. King
 
 ,
 
 563 U.S. 452
 
 , 469-70,
 
 131 S.Ct. 1849
 
 , 1862,
 
 179 L. Ed. 2d 865
 
 , 881 (2011) (citation omitted). After noting the curtain moved, Detective Helms continued to attempt to make contact. The fact that no one inside the house chose to answer either door or yell out from within that they would presently open the doors indicates a clear choice to not speak to the detectives. As such, under the knock and talk exception, the detectives should have left the property at this time. Thus, all the facts obtained by the search of the curtilage after this point were improper.
 

 The State also argues that Detective Klinglesmith was permitted to be in the yard due to a lack of "no trespassing" signs. In support of this contention, the State relies on
 
 State v. Pasour
 
 ,
 
 223 N.C. App. 175
 
 ,
 
 741 S.E.2d 323
 
 (2012), in which the Court found that presence of a "no trespassing" sign may be evidence of a homeowner's expectation of privacy.
 
 Id
 
 . at 178-79,
 
 741 S.E.2d at 326
 
 . However, the Court also found that the presence of a "no trespassing" sign is not dispositive.
 
 Id
 
 .
 

 In
 
 Pasour
 
 , similar to the instant case, officers knocked on the front and side door of a residence, and when they received no response, they moved to the back of the residence
 
 *918
 
 where they discovered marijuana plants.
 
 Id
 
 . at 175-76,
 
 741 S.E.2d at 324
 
 . This Court found that the homeowner had a reasonable expectation of privacy because there was no evidence that the plants could be seen from the front or the road, there was a "no trespassing" sign, there was nothing to suggest the common use of the rear door, and "there [was] no evidence in the record that suggests that the officers had reason to believe that knocking at [the] [d]efendant's back door would produce a response after knocking multiple times at his front and side doors had not."
 
 *123
 

 Id
 
 . at 179,
 
 741 S.E.2d at 326
 
 . While the evidence of a posted no trespassing sign may be evidence of a lack of consent, nothing in
 
 Pasour
 
 supports the State's attempted expansion of the argument that the lack of such a sign is tantamount to an invitation for someone to enter and linger in the curtilage of a residence.
 

 While, in the present case, Detective Klinglesmith described seeing the crawl space and smelling the marijuana from his position in the front of the house, he also testified that he was in the yard at the left corner of the house, rather than on a porch when he made these observations. By moving away from the front door and entering the sides of defendant's yard, approaching the back door, Detective Klinglesmith moved onto the curtilage of defendant's home without a warrant. There is no evidence that the detectives saw or smelled marijuana on their approach to the residence, nor from the front door. It was only after Detective Klinglesmith invaded the curtilage and walked around the home that he smelled and saw it.
 

 While there was some evidence that the rear door was being used by the occupants - the presence of the spider web at the front door and the vehicles parked in the backyard - that did not authorize the detective to approach the back door after failing to make contact at the front door. In addition, none of these facts supports the detective moving through the yard attempting to conduct surveillance. Similar to the detectives in
 
 Pasour
 
 , the detectives here had no evidence that by knocking on the back door someone would finally open the door.
 

 In its conclusions of law, the trial court found that the odor and observation of the marijuana was in plain view from Detective Klinglesmith's location.
 

 In order for the plain view doctrine to apply, (1) the officer must have been in a place where he had a right to be when the evidence was discovered; (2) the evidence must have been discovered inadvertently; and (3) it must have been immediately apparent to the police that the items observed were evidence of a crime or contraband. The burden is on the State to establish all three prongs of the plain view doctrine.
 

 State v. Lupek
 
 ,
 
 214 N.C. App. 146
 
 , 150,
 
 712 S.E.2d 915
 
 , 918 (2011) (internal citation omitted). The plain view doctrine does not apply here because Detective Klinglesmith was not in a place he was entitled to be when he discovered the marijuana.
 

 *124
 
 Furthermore, even if he had been entitled to be in that section of the yard, the crawl space was blocked off in a way that suggested a private space. Here the State relies upon the fact that the detective could see the contraband through a slit in the basement door. In
 
 State v. Tarantino
 
 ,
 
 322 N.C. 386
 
 ,
 
 368 S.E.2d 588
 
 (1988), our Supreme Court held that nothing "suggests that an expectation of privacy is eliminated by quarter-inch cracks in the back wall of an otherwise sealed building."
 
 Id
 
 . at 391,
 
 368 S.E.2d at 591-92
 
 . In
 
 Tarantino
 
 , the officer obtained a warrant based on peering through cracks in a commercial building and observing marijuana inside.
 
 Id
 
 . at 388,
 
 368 S.E.2d at 590
 
 . The building's front door had been padlocked, the back doors nailed shut, and the windows were boarded.
 
 Id
 
 . at 387,
 
 368 S.E.2d at 590
 
 . Our Supreme Court held:
 

 [t]he building's padlocked front door, nailed back doors, and boarded windows indicate that defendant had a subjective expectation of privacy in his building's interior. This expectation was not unreasonable even though there were small cracks between the boards in the building's back wall. The presence of tiny cracks near the floor on the interior wall of a second-floor porch is not the kind of exposure which
 
 *919
 
 serves to eliminate a reasonable expectation of privacy.
 

 Id
 
 . at 390,
 
 368 S.E.2d at 591
 
 .
 

 Here, Detective Klinglesmith testified that the crawl space had padlocks and that he "put [his] eye up to it without touching it ... [he] could see between the slats" to see the marijuana plants. In its findings of fact, the trial court found that Detective Klinglesmith looked through "cracks" to see the plants. While it is unclear how large these "slats" or "cracks" were, the fact that the detective had to put his eye up to the crawl space to see the plants, along with the padlocks on the access door, suggests an area where defendant would expect an amount of privacy. Therefore, defendant had a reasonable expectation of privacy in his locked crawlspace, which was violated when Detective Klinglesmith looked inside without a warrant.
 

 Given all the undisputed facts of this case, we hold that Detective Klinglesmith's actions in moving to the rear door, moving around the yard, and looking into the crawl space constituted an improper warrantless search under the Fourth Amendment. Therefore, the evidence obtained by virtue of the illegal search should have been suppressed. The trial court erred in denying the defendant's motion to suppress.
 

 *125
 
 III.
 
 Conclusion
 

 For all the foregoing reasons, we reverse the order denying the motion to suppress and judgment entered pursuant to defendant's
 
 Alford
 
 pleas.
 

 REVERSED
 

 Judges TYSON and INMAN concur.