IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA20-40

Filed: 15 December 2020

Gaston County, Nos. 17 CRS 065590-91

STATE OF NORTH CAROLINA

v.

MICHAEL SHANE FALLS, Defendant.

Appeal by Defendant from judgments entered 20 May 2019 by Judge Daniel A. Kuehnert in Gaston County Superior Court. Heard in the Court of Appeals 7 October 2020.

*Attorney General Joshua H. Stein, by Assistant Attorney General J. Aldean Webster, III, for the State.*

*Appellate Defender Glenn Gerding, by Assistant Appellate Defender Amanda S. Hitchcock, for Defendant.*

BROOK, Judge.

This case presents the following question: are three law enforcement officers wearing dark clothing impliedly licensed to cut across a person's front yard, swiftly passing a no trespassing sign, and emerge from trees they were using for cover and concealment in order to illuminate, surround, and stop that person's departing car at 9:30 p.m. on a dark, cold mid-December evening? Or does this conduct instead implicate the Fourth Amendment? Common sense tells us no Girl Scouts would

attempt such audacious efforts in peddling their cookies. Accordingly, we must suppress the fruits of the officers' unconstitutional search in this case.

## I. Factual Background and Procedural History

At the suppression hearing, Gastonia Police Officer Clarence Belton testified that he received an anonymous drug complaint that Michael Shane Falls ("Defendant") was selling and growing marijuana out of his home. Officer Belton also received information that Defendant carried a silver revolver and determined that Defendant was a convicted felon.

The next day, 16 December 2017, law enforcement decided to conduct a knock and talk to "further investigate the complaint based on the details" they had received. Around 9:30 p.m. on that "extremely cold" night, Officer Belton, along with Officers J.C. Padgett and S.D. Hoyle, went to Defendant's house to conduct their investigation despite the fact that "[they] usually do the knock and talks . . . during the daylight hours."

The officers parked in a church parking lot next to Defendant's house. They then walked where "the road meets the [Defendant's] property line[,]" or what they later termed walking on the property's right-of-way. Officer Belton then saw "a white male get inside of a vehicle" and told Officers Padgett and Hoyle that he was "possibly our suspect."

Wanting to make contact with him before he left, the officers made a beeline for Defendant's car. In so doing, they cut into Defendant's front yard and "between the tree[s] to go straight to the vehicle. [ ] [I]t g[a]ve [them] cover and concealment as well, just in case there was an issue." The officers "walked swiftly over to th[e] vehicle," passing a no trespassing sign that none of them appreciated in the moment. The car was running and starting to reverse out of the driveway, and, as the officers approached, they turned on their flashlights and shined them at Defendant's vehicle. Officers Belton and Padgett went to the driver side window while Officer Hoyle went around to the passenger side. Officer Belton immediately noticed a silver revolver lying in the passenger seat and within a few seconds also smelled "a pungent odor of marijuana coming from the vehicle" on the driver side.

Officer Belton asked Defendant if he lived at the house and what his name was before telling him they had received a drug complaint. He then asked Defendant to step out of the vehicle and conducted a *Terry* frisk of Defendant for weapons. According to Officer Belton, Defendant was "very belligerent . . . [and] didn't like the fact that we were there" and called someone on his cell phone; at that point, Officer Belton put Defendant in handcuffs because he was not listening to commands. Officer Padgett then recovered the gun from the vehicle and saw several vials in the driver door, which he identified based on their odor and color as THC oil.

Afterwards, Officers Belton and Padgett went to the front door of the residence and knocked several times. Within a few minutes, Defendant's fiancée, Summer Bolt, came outside to speak with the officers. When she opened the door, Officer Belton testified that he could smell the odor of marijuana coming out of the residence. Ms. Bolt did not consent to a search of the residence, so Officer Padgett applied for and received a search warrant. Once Officer Padgett returned with the warrant, he read it to Defendant and Ms. Bolt, and then the officers executed the warrant. Marijuana, paraphernalia, a pill that field-tested positive for methamphetamine, and counterfeit $100 bills were found in the home.

Defendant was charged with possession of methamphetamine, possession of counterfeit instruments, and possession of a firearm by a felon. Defendant moved to suppress, and, during that hearing, Officer Padgett testified as follows regarding how people might access Defendant's front door:

> The sidewalk would be what anybody that was going door-to-door selling anything would take, they would go down -- up the little sidewalk that jets off the driveway[.]
>
> . . .
>
> There was not a worn path in the grass [where we walked], or anything like that. I would think anybody, especially if you parked your vehicle on the roadway, you would go down the driveway. We did -- just because of the freedom of movement, and stuff, we're not going [to] block the driveway. We don't like parking our patrol cars on the road. So that's why we took the path we did. If you were in a mail truck you would probably stop at the driveway

- 4 -

and go down the sidewalk to the door. But that's not the
path that we took.

Officer Belton further testified that "due to the fact [of] it being dark, there's no lights
right there, and us wearing dark clothing, we didn't want to be struck by a vehicle
just doing a simple knock and talk."

Judge Kuehnert denied the motion to suppress by written order on 6
November 2019. The trial court made the following pertinent findings of fact:

> 7. . . . [O]fficers decided to conduct a "knock and talk" at
> 2300 Davis Park Road to further investigate the
> information provided by the anonymous tipster.
>
> 8. At approximately 9:30 p.m. on December 16, Officers
> Belton, Padgett, Hoyle and Lewis arrived at 2300 Davis
> Park Road and parked in the adjacent church parking lot.
>
> 9. The officers walked along the highway right-of-way by
> the house on the grass portion of the highway as they
> walked up to the driveway.
>
> 10. The house could be approached by walking up the
> driveway, which was obvious, or through the yard, which
> was not obvious.
>
> 11. At the end of the driveway was a sidewalk that ran
> parallel to the house and up to the front door.
>
> 12. There was a "no trespassing" sign posted on a tree in
> front of the property.[1]
>
> 13. As [ ] [O]fficers Padgett and Belton approached the
> driveway along the grass right-of-way they noticed a white

---

[1] This finding is unchallenged and thus binding on us on appeal; we also note that the record
reflects Defendant had an additional no trespassing sign in his front yard.

male in a Honda Civic start to back up[ ] (this was indicated because the backup lights came on the vehicle).

14. The officers passed the front door of the house but did not go directly to the front door because there was no obvious path.

15. All of the officers involved then walked over towards the vehicle cutting through the yard approximately 10-20 feet.

16. Officer Belton arrived at the vehicle on the driver side and Officer Padgett was right behind. Officer Hoyle went to the passenger side of the vehicle.

17. As [Officer] Belton arrived he noticed the window was rolled down and began speaking to the individual.

18. The individual identified himself as Michael Shane Falls.

19. Almost immediately, Officers Belton and Padgett noticed an odor of marijuana emanating from the vehicle.

20. At the same time, Officer Hoyle, on the passenger side of the vehicle noticed a silver handgun in plain view on the passenger side of the vehicle.

. . .

24. [Defendant] advised that his fiancé[e], Summer Bolt, was in the residence.

25. [ ] [O]fficer Padgett walked up the driveway to the sidewalk that was perpendicular to the house and walked up to the front door.

. . .

27. According to testimony from [O]fficers Padgett and Belton, approximately 2-3 minutes later, Ms. Bolt came to the door. Upon the door opening, Officer[s] Padgett and Belton noticed an odor of marijuana.

The trial court then made the following pertinent conclusions of law:

39. A knock and talk is valid so long as it is reasonable and does not violate the normal customs of an invitation and is not physically intrusive. (*Jardines*, at 1416).

. . .

41. In the present case, Officer's [sic] Padgett, Belton and Hoyle testified that [ ] they approached the driveway of 2300 Davis Park Road along the right of way open to the public along the side of the road.

42. Officer Belton also testified that himself, Padgett and Hoyle passed the front of the front door by the house. However, there was to [sic] sidewalk or direct path to the door, so the officers continued to the driveway adjacent to the front door.

43. In walking along the right-of-way, the officers followed a path that a person visiting 2300 Davis Park Road would follow if that individual was going to knock on the front door of the house.

44. That [ ] when Officer Padgett saw a white male getting into a car and the br[ake] lights turn on, they immediately cut across the normal path into the curtilage of the yard at 2300 Davis Park Road. Officer Belton testified that he believed that [the] individual was the owner of the house and wanted to talk to him about the drug complaint.

. . .

46. Even though the police officers briefly entered the curtilage of the property[,] it was for talking to the potential homeowner leaving in their car.

47. That the intrusion on the curtilage of the property was brief and minimal. Further, the officers did not use any special equipment or use any special force to enter the property. As a result, it was not an unreasonable intrusion and therefore did not violate the Fourth Amendment to the United States Constitution.

On 20 May 2019, Defendant pleaded guilty to all charges, reserving his right to appeal the denial of the motion to suppress. Judge Kuehnert consolidated the charges and sentenced Defendant to 17 to 30 months' imprisonment, suspended upon 60 months' supervised probation and a 90-day split sentence. Defendant timely noticed appeal.

## II. Analysis

On appeal, Defendant argues that the trial court erred in denying his motion to suppress because the officers exceeded the scope of the implied license to conduct a knock and talk and therefore were not lawfully present when they observed contraband in his vehicle. Defendant also argues that the trial court sentenced him incorrectly.

We agree with Defendant that the trial court erred in denying his motion to suppress and therefore do not reach the issue of whether he was sentenced correctly.

### A. Standard of Review

Our review of a trial court's denial of a motion to suppress "is strictly limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law." *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982). "In addition, the trial court's unchallenged findings of fact are binding on appeal." *State v. Ramseur*, 226 N.C. App. 363, 366, 739 S.E.2d 599, 602 (2013). "This Court reviews conclusions of law stemming from the denial of a motion to suppress *de novo*. . . . Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." *State v. Borders*, 236 N.C. App. 149, 157, 762 S.E.2d 490, 498-99 (2014) (citation omitted).

## B. Governing and Persuasive Authority

The Fourth Amendment to the United States Constitution and Article 1, Section 20 of the North Carolina Constitution protect against unreasonable searches. U.S. Const. amend. IV; N.C. Const. art. I, § 20. "[W]hen it comes to the Fourth Amendment, the home is first among equals. At the Amendment's very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Florida v. Jardines*, 569 U.S. 1, 6, 133 S. Ct. 1409, 1414, 185 L. Ed. 2d 495, 501 (2013) (internal marks and citation omitted). "While law enforcement officers need not shield their eyes when passing by the home on public

thoroughfares, an officer's leave to gather information is sharply circumscribed when he steps off those thoroughfares and enters the Fourth Amendment's protected areas." *Id.* at 7, 133 S. Ct. at 1415 (internal citation and marks omitted). This constitutional protection extends to the "curtilage," which is "the area immediately surrounding and associated with the home[.]" *Id.* at 6, 133 S. Ct. at 1414 (internal citation and marks omitted).

"A knock and talk is a procedure by which police officers approach a residence and knock on the door to question the occupant, often in an attempt to gain consent to search when no probable cause exists to obtain a warrant." *State v. Marrero*, 248 N.C. App. 787, 790, 789 S.E.2d 560, 564 (2016). While a knock and talk does not implicate the Fourth Amendment*, see Kentucky v. King*, 563 U.S. 452, 469-70, 131 S. Ct. 1849, 1862, 179 L. Ed. 2d 865, 880-81 (2011), it is, of course, a tactic employed "for the purpose of gathering evidence[,]" *Jardines*, 569 U.S. at 21, 133 S. Ct. at 1423 (Alito, J., dissenting). But "[w]hen the Government obtains information by *physically intruding* on persons, houses, papers, or effects, a search within the original meaning of the Fourth Amendment has undoubtedly occurred." *Id.* at 5, 133 S. Ct. at 1414 (internal marks omitted) (emphasis added) (quoting *United States v. Jones*, 565 U.S. 400, 406-07 n.3, 132 S. Ct. 945, 950-51 n.3, 181 L. Ed. 2d 911, 919 n.3 (2012)); *see also People v. Frederick*, 500 Mich. 228, 235 n.2, 895 N.W.2d 541, 544 n.2 (2017) ("The

violation of [the defendant's] property rights, combined with the subsequent information-gathering, constituted a search.").

In *Jardines*, the Supreme Court utilized a property-rights framework to assess whether the use of a drug-sniffing dog on a homeowner's porch to investigate the contents of the defendant's home was a search within the meaning of the Fourth Amendment. Holding first that the porch was "part of the home itself for Fourth Amendment purposes[,]" the Court then turned to whether the officers' investigation "was accomplished through an unlicensed physical intrusion." 569 U.S. at 6-7, 133 S. Ct. at 1414-15. Concluding that it was, the Court held that law enforcement may not act outside the scope of the "implicit license [which] typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Id.* at 8, 133 S. Ct. at 1415.

Writing for the majority, Justice Scalia noted that "[c]omplying with the terms of that traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters." *Id.*

> To find a visitor knocking on the door is routine (even if sometimes unwelcome); to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to—well, call the police. The scope of a license—express or implied—is limited not only to a particular area but also to a specific purpose. Consent at a traffic stop to an officer's checking

> out an anonymous tip that there is a body in the trunk does
> not permit the officer to rummage through the trunk for
> narcotics. Here, the background social norms that invite a
> visitor to the front door do not invite him there to conduct
> a search.

*Id.* at 9, 133 S. Ct. at 1416. Justice Scalia emphasized that

> [i]t is not the dog that is the problem, but the behavior that
> here involved use of the dog. We think a typical person
> would find it "a cause for great alarm" . . . to find a stranger
> snooping about his front porch *with or without* a dog.

*Id.* at 9 n.3, 133 S. Ct. at 1416 n.3 (internal citation omitted). Put simply, bloodhound

or not, law enforcement can do no more than the ordinary citizen would be expected

to do. *Id.* at 8, 133 S. Ct. at 1416 ("[A] police officer not armed with a warrant may

approach a home and knock, precisely because that is '*no more than any private

citizen might do*.'") (emphasis added) (citation omitted).

Pursuant to the precedent established by the Supreme Court in *Jardines*, our

appellate courts have underlined "the right of police officers to conduct knock and

talk investigations, so long as they do not rise to the level of Fourth Amendment

searches." *Marrero*, 248 N.C. App. at 790-91, 789 S.E.2d at 564. "This limitation is

necessary to prevent the knock and talk doctrine from swallowing the core Fourth

Amendment protection of a home's curtilage." *State v. Huddy*, 253 N.C. App. 148,

152, 799 S.E.2d 650, 654 (2017). We have emphasized that the implied license

"extends only to the entrance of the home that a 'reasonably respectful citizen'

unfamiliar with the home would believe is the appropriate door at which to knock."

*Id.* (quoting *Jardines*, 569 U.S. at 8 n.2, 133 S. Ct. at 1415 n.2); *see also id.* at 155, 799 S.E.2d at 656 (Tyson, J., concurring) ("[E]ven a seldom-used front door is the door uninvited members of the public are expected to use when they arrive."). "Without this limitation, law enforcement freely could wander around one's home searching for exterior doors and, in the process, search any area of a home's curtilage without a warrant." *Id.* at 152, 799 S.E.2d at 654.

The scope of the implied license to conduct a knock and talk is governed by societal expectations, and when law enforcement approach a home in a manner that is not "customary, usual, reasonable, respectful, ordinary, typical, nonalarming," they are trespassing, and the Fourth Amendment is implicated. *Jardines*, 569 U.S. at 8 n.2, 133 S. Ct. at 1415 n.2. Relevant to distinguishing between a knock and talk and a search is how law enforcement approach the home, the hour at which they did so, and whether there were any indications that the occupant of the home welcomed uninvited guests on his or her property.

First, law enforcement may not approach a home in a manner that "would not have been reasonable for solicitors, hawkers[,] or peddlers." *State v. Stanley*, 259 N.C. App. 708, 717, 817 S.E.2d 107, 113 (2018) (citation and marks omitted) ("Rather than using the paved walkway that led directly to the unobstructed front door of the apartment, the officers walked along a gravel driveway into the backyard in order to knock on the back door, which was not visible from the street."); *see also Huddy*, 253

N.C. App. at 153, 799 S.E.2d at 655 (impermissible knock and talk where officer walked around the entire residence to "clear" the sides of the home, checked the windows for signs of a break-in, and then approached the home from the back door). Similarly, law enforcement cannot "overstay[ ] their 'knock and talk' welcome on the property." *State v. Ellis*, 266 N.C. App. 115, 121, 829 S.E.2d 912, 916 (2019) (violation of Fourth Amendment where detective received no response after knocking on front door and second detective walked around to rear door and then to sides of the defendant's yard); *see also State v. Gentile*, 237 N.C. App. 304, 309-10, 766 S.E.2d 349, 353 (2014) (detectives engaged in "trespassory invasion of defendant's curtilage" where they knocked on front door, received no response, and then proceeded to back of house where they smelled the odor of marijuana).

Relatedly, the hour at which officers conduct their knock and talk is relevant to whether officers have exceeded the scope of the implied license. While this Court has not held that knock and talks are impermissible during a certain time-window, we have approvingly noted that "a number of courts have found late-night inquiries unreasonable because of the societal expectation that members of the public would not knock on one's front door in the middle of the night." *State v. Hargett*, 251 N.C. App. 926, 795 S.E.2d 828, 2017 N.C. App. LEXIS 70, at *6 (2017) (unpublished). Even the dissent in *Jardines* acknowledged that "as a general matter . . . a visitor [may not] come to the front door in the middle of the night without an express invitation."

569 U.S. at 20, 133 S. Ct. at 1422 (Alito, J., dissenting). Noting agreement on this point between the majority and dissenting opinions in *Jardines*, the Michigan Supreme Court unanimously concluded "that a nighttime visit would be outside the scope of the implied license (and thus a trespass)." *Frederick*, 500 Mich. at 238, 895 N.W.2d at 546. Accordingly, "as the Supreme Court suggested in *Jardines*, [ ] the scope of the implied license to approach a house and knock is time-sensitive" and assessed by reference to whether Girl Scouts would do so at the hour in question. *Id.*

Finally, we consider whether a resident has signaled that uninvited guests are not welcome to approach his or her home. Even before *Jardines*, we noted that plainly visible no trespassing signs are "evidence of the homeowner's intent that the [area protected by the sign is] not open to the public[,]" regardless of whether officers have seen the sign or not. *State v. Pasour*, 223 N.C. App. 175, 179, 741 S.E.2d 323, 326 (2012). While a sign alone may not be "sufficient to revoke the implied license[,]" it is one factor to be considered among others, such as the presence of a consistently locked gate or fence and the homeowner or occupant's conduct upon the officers' arrival. *State v. Smith*, 246 N.C. App. 170, 178, 783 S.E.2d 504, 510 (2016). In *Smith*, we held that the presence of a sign alone did not expressly revoke the implied license where the defendant "emerged from his home and greeted the detectives and deputy" and "engaged them in what the record reflects was a calm, civil discussion." *Id.* at 179, 783 S.E.2d at 510; *see also Huddy*, 253 N.C. App. at 151, 799 S.E.2d at 654

("[O]fficers are permitted to approach the front door of a home, knock, and engage in *consensual* conversation with the occupants.") (emphasis added). We also noted that the defendant had inconsistently displayed a no trespassing sign and the gate to his driveway was open on the date the officers arrived, all of which "did not reflect a clear demonstration of an intent to revoke the implied license to approach." *Smith*, 246 N.C. App. at 179, 783 S.E.2d at 510 (internal marks omitted).

This guidance is pertinent here because "an officer must have a lawful right of access to any contraband he discovers in plain view in order to seize it without a warrant" and thus "[a] plain-view seizure [ ] cannot be justified if it is effectuated by unlawful trespass." *Collins v. Virginia*, ___ U.S. ___, ___, 138 S. Ct. 1663, 1672, 201 L. Ed. 2d 9, 21 (2018) (citation omitted). If law enforcement goes beyond the bounds of a knock and talk and, in so doing, sees or smells contraband, then, absent an applicable exception to the warrant requirement, they do not have the right to seize that evidence. *Id.* Accordingly, evidence seized pursuant to a knock and talk that has strayed into a search must be suppressed as fruit of the poisonous tree. *See Stanley*, 259 N.C. App. at 718, 817 S.E.2d at 114.

## C. Application to the Instant Case

Since the scope of the implied license is governed by "background social norms," a knock and talk does not implicate the Fourth Amendment so long as officers behave as a Girl Scout or trick-or-treater would. The officers here decidedly did not.

The trial court found and Defendant challenges on appeal the following findings of fact:

> 10.  The house could be approached by walking up the driveway, which was obvious, or through the yard, which was not obvious.
>
> . . .
>
> 14.  The officers passed the front door of the house but did not go directly to the front door because there was no obvious path.

Defendant also challenges the following conclusion of law:[2]

> 43.  In walking along the right-of-way, the officers followed a path that a person visiting 2300 Davis Park Road would follow if that individual was going to knock on the front door of the house.

Turning to the evidence presented at the suppression hearing, Officer Padgett testified explicitly as to the path that the ordinary person would take and the reasons why he and Officers Belton and Hoyle did not take that path:

> The sidewalk would be what anybody that was going door-to-door selling anything would take, they would go down -- up the little sidewalk that juts off the driveway[.]
>
> . . .
>
> There was not a worn path in the grass [where we walked], or anything like that.  *I would think anybody, especially if you parked your vehicle on the roadway, you would go down the driveway.*  We did -- just because of the

---

[2] Though labeled a conclusion of law, this is more properly classified as a finding of fact because it is a determination reached through "logical reasoning from evidentiary facts."  *Quick v. Quick*, 305 N.C. 446, 451, 290 S.E.2d 653, 657-58 (1982).

freedom of movement, and stuff, we're not going up block the driveway. We don't like parking our patrol cars on the road. So that's why we took the path we did. *If you were in a mail truck you would probably stop at the driveway and go down the sidewalk to the door. But that's not the path that we took.* (Emphasis added.)

And Officer Belton testified that they took a different path because "of vehicles coming by, and the fact that the night being dark and us wearing dark clothing." He also testified that they "went straight to the driveway" because he saw "a white male getting inside a vehicle, possibly [the] suspect." To get to the driveway, the officers "cut between the tree to go straight to the vehicle. [ ] [I]t g[a]ve us cover and concealment as well, just in case there was an issue." There was no testimony to the contrary on any of these points.

While the above testimony is competent evidence in support of finding of fact 10 as persons *could* approach the house through its yard, it offers no support for finding of fact 14 or conclusion of law 43. The testimony from the suppression hearing conclusively established that the officers did *not* follow the path that "a person visiting 2300 Davis Park Road *would* follow if that individual was going to knock on the front door of the house." (Emphasis added.) Instead of "stop[ping] at the driveway and go[ing] down the sidewalk to the door"—like "anybody" would do—the officers took a path that offered them "cover[,] [ ] concealment[,]" and safety since they were out at night in dark clothing. And Officer Belton specifically testified that they did

not go to the front door because they saw Defendant getting into his car—not because there was no "obvious path" to the front door.

The unbidden deviations from the ordinary path that the officers took here for the purposes of obtaining information are of the type that our Court has held time and time again violate the Fourth Amendment. *See, e.g.*, *Stanley*, 259 N.C. App. at 717, 817 S.E.2d at 113 (unlawful knock and talk where officers ignored paved walkway to front door and walked along gravel driveway to back door); *see also* *Huddy*, 253 N.C. App. at 149, 799 S.E.2d at 652 (same where officers walked around the entire residence before proceeding to back of house to knock). But this case presents far more than a 10- to 20-foot intrusion into Defendant's front yard.

First, the manner in which the officers approached the home here, including but not limited to the physical intrusion, was contrary to that of the "reasonably respectful citizen." Instead of parking in Defendant's driveway, they parked in a lot beside Defendant's home. Clad in dark clothing, the three officers walked along Defendant's property line. Then, when they saw Defendant enter his car, they briskly crossed onto his property, cutting through trees because it gave them "cover and concealment[,]" shining flashlights at and surrounding his *moving* vehicle. While the State granted at oral argument such behavior would mark Girl Scouts as "ambitious," this conduct, as Justice Scalia put it, "would inspire most of us to—well, call the police[,]" *Jardines*, 569 U.S. at 9, 133 S. Ct. at 1416, if not resort to self-defense.

Relatedly, the officers here also conducted their "knock and talk" at 9:30 p.m. on a cold, mid-December night. Ordinary citizens are not generally expected so late at night. In fact, this was out of the ordinary even for these officers, who testified that their usual practice was to conduct knock and talks during the daylight hours. The atypical, potentially alarming time of this investigation is difficult to square with the implied license discussion in *Jardines*. *Id.* at 8 n.2, 133 S. Ct. at 1415 n.2.[3]

Not only was the manner and time contrary to that of the "reasonably respectful citizen," there also was a plainly visible no trespassing sign in Defendant's yard, evincing an intent to signal that the front yard was not open to the public. *Jardines*, 569 U.S. at 8 n.2, 133 S. Ct. at 1415 n.2; *see also Pasour*, 223 N.C. App. at 179, 741 S.E.2d at 326. Whereas in *Smith*, the defendant engaged officers in a "calm,

[3] When questioned about the late hour at oral argument, the State noted that the survivor of a car accident might knock on a homeowner's front door at any time to seek help. This is undoubtedly so. But, instead of bolstering the State's argument, it underlines its fundamental weakness.

The test here turns on social norms in routine circumstances—again, how a Girl Scout, trick-or-treater, or "reasonably respectful citizen unfamiliar with the house" would behave—not how someone responds to a potentially life-threatening emergency. *Jardines*, 569 U.S. at 8 n.2, 133 S. Ct. at 1415 n.2; s*ee, e.g.*, *Frederick*, 500 Mich. at 240, 895 N.W.2d at 547 ("[T]he fact that a visitor may approach a home in an emergency does not mean that a visitor who is *not* in an emergency may approach. Emergencies justify conduct that would otherwise be unacceptable; they are exceptions to the rule, not the rule."). Like those individuals, and unlike the survivor of a car accident, law enforcement has control over when it conducts a knock and talk. It stands to reason these officers generally performed knock-and-talks during the day because late-night efforts are more likely to cause alarm—a consideration in whether someone has an implicit license to approach a person's front door. *See Jardines*, 569 U.S. at 8 n.2, 133 S. Ct. at 1415 n.2; *see also id.* at 20, 133 S. Ct. at 1422 (Alito, J., dissenting). Returning to the State's car accident example, one need not look far into North Carolina's past to find such a late-night knock on a front door stemming from those exigent circumstances leading a homeowner to "call the police[,]" *id.* at 9, 133 S. Ct. at 1416, with tragic consequences, *see* Michael Gordon, *Jonathan Ferrell was just starting his life in Charlotte*, The Charlotte Observer (19 July 2015), https://www.charlotteobserver.com/news/local/crime/article27558442.html.

civil discussion" inconsistent with "an intent to revoke the implied license to approach[,]" 246 N.C. App. at 179, 783 S.E.2d at 510, Defendant's conduct here underlined the intent demonstrated by his no trespassing sign. Namely, he questioned the officers' presence on his property and was so "belligerent" in so doing that he was handcuffed. Though Defendant did not have a fence surrounding his property, *Smith* emphasized that it is not the presence of a gate or fence that indicates that a person's property is off-limits to the public, it is the *consistent* presence of a sign or the *consistent* locking of a gate that evinces this intent.[4] Here, Defendant's own conduct plus the lack of any findings or evidence that Defendant did not consistently display a no trespassing sign demonstrated, at the very least, that his yard was not open to the public.

While there may be circumstances where cutting across a person's yard does not exceed the scope of the implied license, *see State v. Grice*, 367 N.C. 753, 754, 767 S.E.2d 312, 314 (2015) (entering curtilage to approach defendant's side door

---

[4] At oral argument, the State suggested the outcome might differ if the officers had seen the no trespassing sign, crossed over a moat filled with alligators, and scaled a fence that surrounded Defendant's property. The dissent similarly argues that Defendant did not revoke the implied license to approach his front door because, in part, he "did not have a fence surrounding his property[.]" *Falls*, *infra* at ___ (Berger, J., dissenting). We need only note in response that the protections of the Fourth Amendment extend to us all regardless of our ability to invest in physical barriers and reptiles. *See United States v. Ross*, 456 U.S. 798, 822, 102 S. Ct. 2157, 2171, 72 L. Ed. 2d 572, 592 (1982) ("[T]he most frail cottage in the kingdom is absolutely entitled to the same guarantees of privacy as the most majestic mansion[.]").

appropriate where front door obscured and inaccessible),[5] and while knocking on Defendant's door at 9:30 p.m. is arguably, as the State contends, just "ambitious" as opposed to plainly beyond the pale, *see Hargett*, 2017 N.C. App. LEXIS 70, at *6-7, and while the presence of a no trespassing sign, by itself, might not expressly revoke the implied license, *see Smith*, 246 N.C. App. at 178, 783 S.E.2d at 510, the "reasonably respectful citizen" would have taken each of these facts into account in determining whether "background social norms" licensed him or her to quickly emerge from trees in a stranger's yard at night with two of his or her colleagues in order to illuminate, surround, and stop a moving car, *Jardines*, 569 U.S. at 8-9 n.2, 133 S. Ct. at 1415-16 n.2. Taken together, the officers' conduct went far beyond the "implied license" that "typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Id.* at 8, 133 S. Ct. at 1415.[6]

---

[5] Defendant notes both that "[t]he continuing validity of *Grice*'s ultimate holding is questionable following the United States Supreme Court's later decision in *Collins*[,]" and that it is not necessary for us to weigh in on this issue because of the distinguishing features of the current controversy. We agree on both counts.

[6] The dissent primarily relies on pre-*Jardines* and/or pre-*Collins*, non-binding case law in arguing that this was a knock and talk instead of a search, most notably *United States v. Walker*, 799 F.3d 1361 (11th Cir. 2015). Of course, *Walker* is at most persuasive authority to this Court, *State v. Woods*, 136 N.C. App. 386, 390, 524 S.E.2d 363, 365 (2000) ("[W]ith the exception of the United States Supreme Court, federal appellate decisions are not binding upon either the appellate or trial courts of this State."), and, as with *Grice*, there are serious questions as to whether *Walker*'s holding survives *Collins*, ___ U.S. at ___, 138 S. Ct. at 1672 ("[S]earching a vehicle parked in the curtilage involves not only the invasion of the Fourth Amendment interest in the vehicle but also an invasion of the sanctity of the curtilage.").

Regardless of *Walker*'s dubious legal force, it is also factually distinguishable for several material reasons. First, law enforcement in *Walker* approached the defendant's "main door" via a

The officers here strayed beyond the bounds of a knock and talk; therefore, the seizure of evidence based on their trespassory invasion cannot be justified under the plain view doctrine. *Collins*, ___ U.S. at ___, 138 S. Ct. at 1672 ("[A]n officer must have a lawful right of access to any contraband he discovers in plain view in order to seize it without a warrant[.]"). Officers Padgett, Belton, and Hoyle did not have a right to be where they were when they saw the revolver and when they smelled marijuana in Defendant's car. Thus, the trial court erred in denying Defendant's motion to suppress.

## IV. Conclusion

We "are not required to exhibit a naivete from which ordinary citizens are free." *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977). It takes no fine-grained legal knowledge to appreciate that a Girl Scout troop, a trio of teenage pranksters down the block, or perhaps more sinister characters are not impliedly licensed to emerge from trees that they were using for cover and concealment and cut across a person's yard, swiftly passing a no trespassing sign, to illuminate, surround, and stop that person's departing car on a dark, mid-December evening. It only requires common sense.

---

gravel driveway leading to it—starting on the path the Girl Scouts would take. 799 F.3d at 1362. Law enforcement also did not take steps to conceal their appearance or approach from the defendant as they did in the present case. *Id.* Furthermore, there was no evidence that the defendant displayed a visible no trespassing sign on his property. *Id.* Finally, the defendant was sleeping inside of his stationary vehicle, which was turned off—not reversing out of his driveway—when approached by law enforcement. *Id.*

Because law enforcement can do no more than a private citizen in this context, the conduct in question implicated the Fourth Amendment. And because the officers lacked a warrant supported by probable cause and no other exception to the Fourth Amendment's warrant requirement applied in this case, we conclude that the evidence in question was illegally obtained. Accordingly, we reverse the trial court's denial of the motion to suppress.

REVERSED.

Judge ZACHARY concurs.

Judge BERGER dissents by separate opinion.

BERGER, Judge, dissenting in separate opinion.

Because the officers did not exceed the scope of their implied license, I respectfully dissent.

Our review of a trial court's denial of a motion to suppress "is strictly limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law." *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982). "The trial court's conclusions of law . . . are fully reviewable on appeal." *State v. Reaves-Smith*, ___ N.C. App. ___, ___, 844 S.E.2d 19, 22 (2020) (citation and quotation marks omitted). "Unchallenged findings of fact, where no exceptions have been taken, are presumed to be supported by competent evidence and binding on appeal." *State v. McLeod*, 197 N.C. App. 707, 711, 682 S.E.2d 396, 398 (2009) (*purgandum*).

On appeal, Defendant contends that the trial court erred when it denied his motion to suppress because the officers (1) exceeded the scope of their implied license to conduct a knock and talk by cutting across "approximately 10-20 feet" of his front yard to approach his vehicle; and (2) were not lawfully present when they observed the contraband in plain view in his vehicle. In support of this argument, Defendant specifically challenges findings of fact 10 and 14, which state:

> 10. The house could be approached by walking up the driveway, which was obvious, or through the yard, which was not obvious.

> 14. The officers passed the front door of the house but did not go directly to the front door because there was no obvious path.

In addition, Defendant challenges conclusions of law 42, 43, and 47, which are set forth below:

> 42. Officer Belton also testified that himself, Padgett, and Hoyle passed the front of the front door by the house. However, there was no sidewalk or direct path to the door, so the officers continued to the driveway.

> 43. In walking along the right-of-way, the officers followed a path that a person visiting 2300 Davis Park Road would follow if that individual was going to knock on the front door of the house.

> 47. That the intrusion on the curtilage of the property was brief and minimal. Further, the officers did not use any special equipment or use any special force to enter the property. As a result, it was not an unreasonable intrusion and therefore did not violate the Fourth Amendment of the United States Constitution.

Although conclusions of law 42 and 43 are mixed findings of fact and conclusions of law, "we do not base our review of findings of fact and conclusions of law on the label in the order, but rather, on the substance of the finding or conclusion." *Reaves-Smith*, ___ N.C. App. at ___, 844 S.E.2d at 24 (citation and quotation marks omitted). We review these conclusions to determine whether they are supported by competent evidence. *Id.* at ___, 844 S.E.2d at 22.

Because Defendant challenges no other findings of fact, all remaining findings are presumed to be supported by competent evidence and are binding on appeal. *See*

*McLeod*, 197 N.C. App. at 711, 682 S.E.2d at 398 ("Unchallenged findings of fact . . . are presumed to be supported by competent evidence and binding on appeal" (citation and quotation marks omitted)).

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. "The touchstone of the Fourth Amendment is reasonableness." *State v. Grice*, 367 N.C. 753, 756, 767 S.E.2d 312, 315 (2015) (citation and quotation marks omitted).

"Because an individual ordinarily possesses the highest expectation of privacy within the curtilage of his home, that area typically is afforded the most stringent Fourth Amendment protection." *State v. Smith*, 246 N.C. App. 170, 180, 783 S.E.2d 504, 511 (2016) (citation and quotation marks omitted). "[C]urtilage . . . is the area immediately surrounding and associated with the home. . . [and] law enforcement ordinarily cannot enter the curtilage of one's home without either a warrant or probable cause and the presence of exigent circumstances that justify the warrantless intrusion." *State v. Huddy*, 253 N.C. App. 148, 151, 799 S.E.2d 650, 654 (2017) (citation and quotation marks omitted).

"A knock and talk is a procedure by which police officers approach a residence and knock on the door to question the occupant, often in an attempt to gain consent

to search when no probable cause exists to obtain a warrant." *State v. Stanley*, 259 N.C. App. 708, 714, 817 S.E.2d 107, 112 (2018) (citations and quotation marks omitted). Accordingly, "law enforcement [is not] absolutely prohibited from crossing the curtilage and approaching the home, based on our society's recognition that the knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers, and peddlers[.]" *Grice*, 367 N.C. at 759-60, 767 S.E.2d at 318. "[W]hen officers enter private property for the purpose of a general inquiry or interview, their presence is proper and lawful[.]" *State v. Church*, 110 N.C. App. 569, 573-74, 430 S.E.2d 462, 465 (1993) (citation omitted).

Defendant argues that the officers exceeded their implied license by cutting across "approximately 10-20" feet of his front yard because such conduct would not have been reasonable for an uninvited guest. At the suppression hearing, Officer Belton testified that there was no path directly to the front door from the road and that to approach the front door you would have to "[e]ither come up behind the tree, or beside the tree, and go straight to it, or the path that we took to go down the driveway." Further, Officer Belton testified that the driveway was the only paved path to get to the front door. This testimony supports findings of fact 10, 14, and 43, namely that the officers had to walk past the front door to get to the driveway and that the obvious path to the house was down the driveway and through the sidewalk. Therefore, these findings are supported by competent evidence.

Defendant also challenges conclusion of law 43, which again, is a mixed finding of fact. However, at the hearing, Officer Belton testified that "[w]hen we arrived at the residence we walked pretty much where the road meets the property line . . . [t]here's no sidewalk, so we pretty much had to [walk] on the street but a little off on the road . . . just because of vehicles coming by, and the fact that the night being dark[.]" This testimony supports that a reasonable person approaching the house would have to walk along the right of way to approach the driveway because there is no sidewalk. Therefore, this finding is supported by competent evidence.

Next, we must determine whether the trial court's findings of fact support conclusion of law 47 that officers cutting across "approximately 10-20 feet" of Defendant's yard was not an "unreasonable intrusion and therefore did not violate the Fourth Amendment of the United States Constitution."

Conduct that would be unreasonable for "solicitors, hawkers or peddlers . . . is also unreasonable for law enforcement officers." *Stanley*, 259 N.C. App. at 717, 817 S.E.2d at 113 (*purgandum*). "Law enforcement may not use a knock and talk as a pretext to search the home's curtilage [because] no one is impliedly invited to enter the protected premises of the home in order to do nothing but conduct a search." *Huddy,* 253 N.C. App. at 152, 799 S.E.2d at 654 (*purgandum*). In fact, our courts have repeatedly held that an officer exceeds the scope of their implied license when they approach a home from the backyard, or snoop around the property to investigate

the home. *See id.* at 149, 799 S.E.2d at 655 (finding that the officer exceeded the scope of implied license where officer ran a license plate on a car not visible from the street, checked windows for signs of a break-in, and walked around the entire residence to clear the sides of the home); *see also Stanley*, 259 N.C. App. at 717, 817 S.E.2d at 113 (determining that the officers exceeded the scope of implied license where they walked along a gravel driveway to the back door instead of using a paved walkway to the front door).

Here, after seeing a white male matching Defendant's description get into a vehicle, officers cut through "approximately 10-20 feet" of Defendant's front yard to approach the vehicle and to see if Defendant would speak with them – a valid purpose of a knock and talk. *See Church*, 110 N.C. App. at 573-74, 430 S.E.2d at 465 (finding that "when officers enter private property for the purpose of a general inquiry or interview, their presence is proper and lawful."); *see also United States v. Raines*, 243 F.3d 419, 421 (8th Cir. 2001) ("We have previously recognized that law enforcement officers must sometimes move away from the front door when attempting to contact the occupants of a residence."); *see also United States v. Taylor*, 458 F.3d 1201, 1205 (11th Cir. 2006) ("Such a minor departure from the front door [when officers proceeded to the curtilage of the defendant's property after defendant yelled 'Don't shoot my dog!'] does not remove the initial entry from the "knock and talk" exception to the warrant requirement."). In fact, a driveway is an access route to the front door

where officers are allowed to approach to conduct a "knock and talk." *Smith*, 246 N.C. App. at 181, 783 S.E.2d at 511. Accordingly, the officers did not exceed the scope of their implied license by cutting across "approximately 10-20 feet" of Defendant's front yard to approach the driveway.

Defendant also argues that the "No Trespassing" sign on a tree in his front yard expressly removed the officers' implied license to approach his home. However, a "No Trespassing" sign, alone, is not "sufficient to revoke the implied license to approach." *Id*. at 178, 783 S.E.2d at 510; *see, e.g., United States v. Bearden*, 780 F.3d 887, 893-94 (8th Cir. 2015) (upholding "knock and talk" where officers entered property through an open driveway gate marked with "No Trespassing" signs). Rather, the homeowner must clearly demonstrate, through either a physical obstruction or verbal instructions, their intention to revoke the implied license. *See Smith*, 246 N.C. App. at 178, 783 S.E.2d at 510. Here, Defendant had only one "No Trespassing" sign, did not have a fence surrounding his property, and did not express his intention to revoke the implied license to approach until after the officers noticed the contraband in plain view. Therefore, Defendant did not effectively revoke the officers' implied license to approach.

Finally, Defendant contends under *Florida v. Jardines*, 569 U.S. 1 (2013) that the officers conducted an investigatory search when they approached his vehicle and exceeded the scope of their implied license by approaching his vehicle at 9:30 at night.

However, *Jardines* is distinguishable. Here, the officers did not approach Defendant's car with the purpose of discovering incriminating evidence, nor did the officers approach with a forensic narcotics dog. *See Jardines*, 569 U.S. at 9-10 (holding that using a police dog to sniff for drugs on the front porch in hopes of discovering incriminating evidence exceeds the scope of the knock and talk exception). Rather, the officers approached Defendant's property with the intent to speak with him after receiving an anonymous tip, which led to a "knock and talk." *Id.* at 8 ("[A] police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.' " (citation omitted)).

This case is similar to *United States v. Walker*, 799 F.3d 1361 (11th Cir. 2015). In *Walker*, officers went to the defendant's residence at 5:04 a.m. to conduct a knock and talk to see if a man with an outstanding warrant was inside his house. *Id.* at 1362. Rather than first going to the front door, officers approached the defendant in his carport. The Eleventh Circuit held that the officers "small departure from the front door [to go to the carport] when seeking to contact the occupants [was] permissible[,]" and that the officers did not conduct an investigatory search when they approached the vehicle because "the officers' behavior did not objectively reveal a purpose to search[.]" *Id.* at 1363-64. Further, the Eleventh Circuit held that going to someone's house before sunrise was not unreasonable because "although many

- 8 -

people might normally be asleep at that early hour, the light on in the car indicated otherwise." *Id.* at 1364.

Here, as in *Walker*, the officers did not approach to conduct a search; rather, their main purpose was to follow up on the anonymous tip. Additionally, it was a small departure when the officers cut across "10-20" feet of Defendant's grass to then approach Defendant, who was outside of his house in a running car at 9:30 p.m. Thus, the officers' actions in approaching Defendant were permissible and not unreasonable under the Fourth Amendment.

Accordingly, the officers did not exceed the scope of their implied license, they were lawfully present when they arrived at Defendant's vehicle, and the subsequent searches were valid under the Fourth Amendment.